**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GLORIA ESTHER QUINONES PRATT,** | : | **CIVIL ACTION** |
| *On behalf of Y.D.C.Q.,* | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **20-CV-6176** |
| | : | |
| **KILOLO KIJAKAZI,**[1] | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                    **7/12/2023**

Plaintiff Gloria Esther Quinones Pratt brought this action on behalf of her minor child,

Y.D.C.Q., pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of Social

Security Administration's decision denying her claim for Supplemental Security Income ("SSI")

benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33.  This matter is before me

for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request

for Review (ECF No. 13) is **DENIED**.

## I.     PROCEDURAL HISTORY

Plaintiff protectively filed an application for SSI benefits on September 20, 2017,

alleging that Y.D.C.Q. had been disabled since August 16, 2017.  (R. 211-20).  The claim was

denied at the initial level, and Plaintiff requested a hearing before an Administrative Law Judge

---

[1]  Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi has been
substituted for Andrew Saul as the Defendant in this case.

("ALJ").  (R. 102-22).  Represented by counsel, both Plaintiff and Y.D.C.Q. testified with the

assistance of an interpreter at an administrative hearing on February 15, 2019.  (R. 46-82).  On

May 17, 2019, the ALJ issued a decision unfavorable to the Plaintiff.  (R. 16-45).  Plaintiff

appealed the ALJ's decision, and the Appeals Council denied her request for review on October

7, 2020, thereby making the ALJ's decision the final decision of the Commissioner for purposes

of judicial review.  (R. 1-9).

On December 4, 2020, Plaintiff filed a complaint in the United States District Court for

the Eastern District of Pennsylvania.  (Compl., ECF No. 1).  Plaintiff consented to my

jurisdiction pursuant to 28 U.S.C. § 636(c).  (Consent, ECF No. 3).  She filed a Brief and

Statement of Issues in Support of Request for Review on April 21, 2022.  (Pl.'s Br., ECF No.

13).  On May 16, 2022, the Acting Commissioner filed a response.  (Def.'s Br., ECF No. 14).

## II.      FACTUAL BACKGROUND

The Court has reviewed the administrative record in its entirety and summarizes here the

evidence relevant to the instant request for review.[2]

Y.D.C.Q. was born on August 18, 2010, making him nine years old on the date the

application was filed.  (*See, e.g.*, R. 25, 232).

### A.      Medical Evidence and School Records

On September 12, 2017, Y.D.C.Q. was examined at Esperanza Health Center.  (R. 572-

80).  Plaintiff reported that her son had problems with hyperactivity, paying attention, and

fighting with his sibling.  (R. 579).  The mental status examination results were unremarkable

---

[2] According to Plaintiff, "[w]hile Y.D.C.Q. has asthma and G.E.R.D., it is agreed that
they are not disabling."  (Pl.'s Br., ECF No. 13, at 2).  It is also undisputed that he does not have
sleep apnea.  (*Id.*).  The Court will not address the child's physical impairments at this time.

apart from a finding of extreme hyperactivity.  (R. 577-79).  Y.D.C.Q. was diagnosed with

unspecified behavioral and emotional disorders.  (R. 579-80).

On August 21, 2017, Y.D.C.Q. presented to Cognitive Behavioral Services, Inc.

("Cognitive Behavioral Services") for a comprehensive biopsychosocial evaluation ("CBE").

(R. 418-29).  Plaintiff reported that her son, who speaks only Spanish, had problems with

aggression and violence, fighting with his siblings and in school, tantrums, sleeping, and

language.  (R. 418, 420).  Plaintiff and her family had recently moved to Philadelphia from

Puerto Rico.  (R. 420).  Except for a finding of blunt affect, Y.D.C.Q.'s mental status

examination was unremarkable.  (R. 426).  Cognitive Behavioral Services recommended weekly

psychotherapy sessions and monthly psychiatric evaluations.  (R. 428).  Y.D.C.Q. returned to

Cognitive Behavioral Services for another CBE on October 11, 2017, where his mother again

reported behavioral problems at both school and home as well as concentration, attention, and

sleeping difficulties.  (R. 340-55).  His mental status examination findings were unremarkable

except for findings of impaired memory and impulsiveness, which Y.D.C.Q. demonstrated by

interrupting Plaintiff.  (R. 343-44).  Y.D.C.Q. was diagnosed with ADHD, and it was

recommended that he receive individual therapy, family therapy, and pharmacotherapy.  (R.

345). [3]

Following his August 2017 CBE, Y.D.C.Q. began to receive outpatient medical health

treatment at Cognitive Behavioral Services, including both weekly individual psychotherapy

sessions and monthly psychiatric medication management appointments.  (*See* R. 417-545).

Changes were made in the medications and their dosages.  (R. 503-06).  Plaintiff indicated that

---

[3] Y.D.C.Q. continued to receive medical treatment at Esperanza Health Center.  (R. 572-605).

the medications resulted in some improvement in Y.D.C.Q.'s behavior. (*See, e.g.*, R. 462). However, Plaintiff subsequently told the psychiatrist that her son misbehaved, fought with his sister, and had problems with sleeping and concentration, although "for some reason his grades have been good." (R. 476, 479). At his therapy sessions, Y.D.C.Q. talked about various problems he was having, such as conflicts with other students and his suspensions from school for fighting, talking too much, and not listening to the teacher. (R. 444, 446, 450, 454, 458). The child spoke about what he was doing to help his mother and stated that he was making efforts to do his homework and to stop fighting with his sister. (R. 436, 442, 445, 447, 450). He also said that he enjoyed his summer vacation, doing magic, and watching movies. Y.D.C.Q. was able to engage in various activities during his therapy sessions, including playing with puzzles, memory cards, and playdough. (R. 481-94, 498-502, 512-24). His mental status examination findings were largely normal, although there were occasional findings of impaired memory, impulsivity, restlessness, and an apparent lack of reaction to internal or external stimuli. (R. 446-47, 449-57, 473-502, 509-524, 532, 534, 536, 538, 540).

During an office visit at Esperanza Health Center on January 23, 2018, Plaintiff reported that Y.D.C.Q. was still very hyperactive and inattentive at school. (R. 594). According to her, his behavior was worse when around his sister, and the psychiatrist refused to see the siblings together. (*Id.*). Y.D.C.Q. was found to be cooperative but also very hyperactive. (R. 595).

As of September 2017, Y.D.C.Q. was enrolled in second grade regular education classes, including English as a Second Language ("ESOL"), at a Philadelphia public school. (R. 252). He received passing grades for the 2017-2018 school year, except for an F in the fourth quarter of the year in Instrumental Music, and he was promoted to the third grade. (R. 606, 635, 642). Y.D.C.Q. was suspended on November 29, 2018 for assault on a school community member. (R. 303). The suspension notice stated that he hit a male student several times and shoved a

4

female staff member.  (*Id.*).

On November 30, 2017, Y.D.C.Q. presented for a child mental status and intelligence evaluation with Brook Crichlow, Psy.D.  (R. 383-91).  Plaintiff reported that her son had sleep disturbance problems, poor grades, and several behavioral issues, including engaging in defiant, disruptive, and argumentative conduct, physical aggression, and altercations with his siblings and at school.  (R. 384-85).  Y.D.C.Q. also required redirection.  (R. 385).  The child was cooperative, fidgety, and restless, and at times needed to be redirected during the evaluation.  (R. 385).  The results of the child's mental status examination were unremarkable except for findings of fidgetiness, restlessness, slouching, low average to borderline cognitive functioning, somewhat limited general fund of information, poor insight, and poor judgment.  (R. 385-86). Dr. Crichlow administered the Test of Nonverbal Intelligence, Four Edition ("TONI-4"), which yielded a TONI-4 Quotient of 90, percentile rank of 26, indicating that Y.D.C.Q. scored within the average range of perceptual functioning as compared to his peers.  (R. 386-87).  Stating that Y.D.C.Q.'s prognosis was fair given his moderate behavioral difficulties, the psychologist diagnosed ADHD and unspecified disruptive impulsive control and conduct disorder.  (R. 387). He recommended that Y.D.C.Q. continue to receive mental healthcare services.  (*Id.*).  In a Childhood Medical/Psychological Source Statement of Functional Abilities ("MSS"), Dr. Crichlow opined that Y.D.C.Q. had moderate inattention in the domain of acquiring and using information; moderate inattention and hyperactivity in the domain of attending and completing tasks; moderate defiance, argumentativeness, and aggression in the domain of interacting and relating with others; and moderate anger outburst and aggression in the domain of caring for himself.  (R. 376-78).

David B. Klebanoff, M.D., conducted a pediatric examination on November 30, 2017. (R. 375-82).  Diagnosing ADHD (R. 386), he opined in an accompanying MSS that Y.D.C.Q.

was age appropriate in acquiring and using information, interacting and relating with others, and caring for self.  (R. 379-82).  As to his ability to attend and complete tasks, Dr. Klebanoff noted that the child had ADHD.  (R. 380).

In December 2017, state agency psychologist Paul Taren, Ph.D., and state agency pediatrician Anjana Popat, M.D. opined that Y.D.C.Q. had less than marked abilities in the domains of acquiring and using information, attending to and competing tasks, and caring for himself.  (R. 107).  Dr. Taren and Dr. Popat stated that Y.D.C.Q. had no limitations in the domains of interacting and relating with others, moving and manipulating objects, and health and physical well-being.  (R. 107-08).

Licensed psychologist Anne Marie Buck, M.A. conducted a CBE of Y.D.C.Q. on February 28, 2018.  (R. 409-16).  The school counselor referred Y.D.C.Q. for an evaluation to assess his behavioral and service needs,  specifically whether he should receive supplemental therapeutic services ("STS") at the school.  (R. 409).  According to the counselor, the child fought with his peers and was easily distracted and impulsive.  (*Id.*)  At the time of the CBE, Y.D.C.Q. had recently returned from a two-day suspension for simple assault.  (*Id.*).  STS staff observed the child and reported extreme hyperactivity/impulsivity, non-compliance with teacher's directives and class rules, and negative peer interactions.  (*Id.*).  Y.D.C.Q.'s teacher and mother reported similar issues.  (R. 409-10).  His behavior was worse during unstructured time, and other children and teachers complained daily about his conduct.  (*Id.*).  According to Plaintiff, he was suspended for hitting and scratching a child in the face and received another suspension for fighting with three peers on the same day.  (R. 410).  She claimed that the teacher told her she was overwhelmed by Y.D.C.Q.'s conduct, that verbal altercations between her son and daughter occurred on a daily basis, and that physical fighting (punching and pulling hair) is occurring every other day.  (*Id.*).  Y.D.C.Q. had a history of exposure to domestic violence

6

perpetrated by his biological father.  (R. 410-11).  Y.D.C.Q. informed Ms. Buck that his home

life was "bad" because his two-year old brother kicked and hit him and his stepfather struck him

with a cable thirty times.  (R. 412).  Plaintiff claimed that her son was lying about being struck

by his stepfather.  (R. 414).  A report of possible abuse was made to the child line.  (R. 412).

Mental status examination findings were unremarkable, and the child remained seated and

cooperative during his examination.  (*Id.*).

The Teacher Report Form ("TRF") completed by Y.D.C.Q.'s teacher for the CBE

indicated that the child had more problems than were typically reported by teachers of boys aged

six to eleven in the particular areas of social relationships, thought problems, attention problems,

and rule-breaking behavior.  (R. 413).  Plaintiff likewise completed the Child Behavior Checklist

("CBCL") showing more problems in social relationships, attention problems, rule-breaking

behavior, and aggression than typically reported by parents of boys aged six to eleven.  (*Id.*).

Plaintiff also indicated that her son had four or more close friends, but saw them less than once a

week outside of school.  (*Id.*).

Diagnosing Intermittent Explosive Disorder ("IED") and ADHD, Ms. Buck identified

several psychosocial and contextual factors or potential barriers to treatment, including a

language barrier, the child's exposure to domestic violence, his mother's history of depression

and anxiety, and the pending physical abuse investigation.  (R. 414-15).  The clinical

psychologist recommended that Y.D.C.Q. receive STS services.  (R. 414-15).  A "School Based

Services Treatment Plan" was accordingly prepared in April 2018.  (R. 609-17).  According to

the plan document, Y.D.C.Q.'s CANS ("Child and Adolescent Needs and Strengths") score

showed that he had severe needs in the domains of impulsivity/hyperactivity, oppositional

behavior, and anger control.  (R. 611).  He had minimal needs in the areas of conduct and

adjustment to trauma.  (*Id.*).  The child continued to exhibit a high level of hyperactivity,

inattention, and aggression at both school and home, his ADHD was not sufficiently managed with medication and outpatient therapy, and he required additional support at school.  (R. 612). The April 2018 plan also noted that Y.D.C.Q. was beginning to establish solid therapeutic relationships with STS staff and that he said he liked to play on his PlayStation and with his dog, paint, and play with Legos at school.  (R. 611).  Treatment goals and objectives for the STS included developing anger management skills, helping the child engage with peers in an appropriate fashion, and assisting with his ability to respect authority figures.  (R. 613-15).

On August 14, 2018, Suzanne Kim Chung, Psy.D., conducted another CBE of Y.D.C.Q. (R. 621-34).  His mental status examination was unremarkable except for a finding that he had difficulty understanding English and the notation that his behavior was "hyper."  (R. 622). Plaintiff reported that her son had problems with hyperactivity, fighting, disrespecting teachers, irritability, hallucinations, argumentative behavior, and sleeping.  (R. 621).  The child's teacher also stated that she often witnessed him instigating conflicts and then blaming others.  (R. 622). In a second TRF, the teacher rated the child's performance in four subjects at somewhat below grade level.  (*Id.*)  She observed that the child worked slightly less hard, behaved somewhat more appropriately, learned slightly less, and was happy about the same as compared to typical students of the same age.  (*Id.*).  Based on the TRF, Y.D.C.Q. was found to have more problems than were typically reported by teachers of boys aged six to eleven in the specific areas of social relationships, thought problems, rule-breaking behavior, and aggression.  (*Id.*).  Plaintiff's updated CBCL checklist similarly indicated somatic complaints and problems with social relationships, thought, attention, rule-breaking behavior, and aggression.  (*Id.*).  Plaintiff also reported that her son had no close friends.  (*Id.*).

Dr. Chung diagnosed Oppositional Defiant Disorder ("ODD") and ADHD and identified substantially the same potential barriers to treatment and psychosocial and contextual factors as

Ms. Buck.  (R. 624-25).  The psychologist recommended that Y.D.C.Q. continue to receive STS services.  (R. 625).

An updated STS treatment plan was implemented in October 2018.  (R. 642-53).  As part of the plan, another CANS assessment was conducted.  (R. 644).  Y.D.C.Q. was found to have a severe need in the area of impulsivity/hyperactivity and moderate needs in oppositional conduct and anger control.  (*Id.*).  It was also noted that Y.D.C.Q. was beginning to establish "solid, therapeutic relationships with STS staff."  (R. 645).  The teacher reported that the child appeared to be interested in finishing his homework and behaving in the classroom, while acknowledging that he continued to use physical aggression with some peers outside of the classroom.  (*Id.*)  His treatment goals and objectives included replacing aggression with positive and appropriate interactions with peers, respecting rules and responding to direction from authority figures, and improving attentive and on-task behaviors to complete school assignments.  (R. 647-48).

### B.     Non-Medical Evidence

The record also contains non-medical evidence.  Plaintiff completed a Child Function Report for Y.D.C.Q.  (R. 241-50).  She indicated that her son's impairments affect both his behavior with other people and his ability to pay attention and stick with a task.  (R. 247, 249).  She also indicated that Y.D.C.Q. had no limitations in his ability to progress in learning, function physically, or take care of his personal needs.  (R. 245-46, 248).

At the administrative hearing, Y.D.C.Q. testified that he is eight years old and in the third grade.  (R. 51, 56).  He lives with his mother, stepfather, sister, and brother.  (R. 52).  He has a PlayStation, his favorite game is Fortnite, and he likes to play with a remote control car.  (R. 52-53).  He said that he takes medication even though it makes him feel "too heavy" or angry.  (R. 53-54).  According to Y.D.C.Q., he regularly completes and turns in his homework.  (R. 56). Y.D.C.Q. has friends at school, plays games during recess, and goes to the school library.  (R.

57, 59-62).  He testified that he enjoys school and that his grades range from As to Ds.  (R. 58).

He receives support at school.  (R. 58-59, 64-65).  Y.D.C.Q. admitted that he gets into trouble at

school for pushing other students, but he said that he does not "start[] the fights" and that

"somebody is bothering [him]."  (R. 63).  He admitted that he was suspended the previous year,

but testified that "this [has] been a good year" for him.  (*Id.*).  The child can shower, bathe, and

dress himself, and does chores like cleaning his room.  (R. 65-66).  He often fights with his sister

over "who gets to go first" and similar disputes.  (R. 66-67).  On the weekends, Y.D.C.Q. goes to

the park or to his aunt's home.  (R. 67-68).  He indicated that he has one friend with whom he

spends time outside of school.  (R. 68).

Plaintiff testified that her son has been diagnosed with chronic ADHD and asthma.  (R.

69).  Asked about Y.D.C.Q.'s testimony that "he has a friend he goes to the park with and plays

outside," Plaintiff testified that there is no such friend; his uncle takes her son to the park and

plays with him.  (R. 70).  At this point in the hearing, the child interjected, and the ALJ informed

Plaintiff that "I think he disagrees with you."  (R. 70).  The ALJ explained that she would weigh

all the evidence, that Y.D.C.Q. did not "have to argue about it," and that the hearing would be

done shortly.  (R. 70-71).  Plaintiff further testified that Y.D.C.Q. sees a therapist every week

and a psychiatrist once a month and takes several medications, which help "[a] little bit."  (R. 71-

72).  The medications were adjusted because they were causing headaches.  (R. 72-73).  Her

son's grades range from As to Ds.  (R. 73).  "He cannot stand still for five seconds," and he is

always fighting with other children, especially his sister and two boys in his class.  (R. 74-78).

Approximately one year before the hearing, he bit a daycare teacher on the arm.  (R. 74, 80-82).

According to Plaintiff, she removed Y.D.C.Q. from daycare and had to quit her job to take care

of him.  (R. 80-81).  He also has been suspended from school for fighting on two separate

occasions.  (R. 75-78).  Plaintiff further stated that her son participates in gym at school and likes

to paint, write, and draw at home.  (R. 70, 75).

Plaintiff was asked about any involvement by the Department of Human Services ("DHS") with the family.  (R. 76).  She indicated that there had been an investigation in Puerto Rico involving Y.D.C.Q.'s biological father, which was now closed.  (R. 76-77).

## III.   LEGAL STANDARD

Under the Social Security Act, the Commissioner must apply a three-step sequential evaluation process to determine if a child under the age of eighteen is disabled.  20 C.F.R. § 416.924(a).  A child under eighteen is eligible for SSI benefits only if: (1) he is not performing substantial gainful activity; (2) he has a medically determinable impairment or combination of impairments that is severe; and (3) the impairment or combination of impairments meets, medically equals, or functionally equals the severity of one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 416.924.

If the child's impairment does not medically meet a listing, the examiner must determine whether the impairment functionally equals a listing.  An impairment or combination of impairments functionally equals a listed impairment if it causes a "marked" limitation in two of six domains of functioning or an "extreme" limitation in one of those six domains.  20 C.F.R. § 416.926(a). [4]  The six domains of functioning are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

---

[4]  A "marked" limitation "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).

Judicial review of a final decision of the Commissioner is limited.  A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards.  *See, e.g.*, *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence is "more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it.  *See, e.g.*, *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The Court exercises plenary review over legal issues.  *See, e.g.*, *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## IV.    ALJ'S DECISION

In her decision, the ALJ made the following findings:

1.    The claimant was born on August 18, 2010.  Therefore, he was a school-age child on September 20, 2017, the date the application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2.    The claimant has not engaged in substantial gainful activity since September 20, 2017, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder (ODD) (20 CFR 416.924(c)).

4.    The claimant does not have an impairment or combination of

12

impairments that meets or medically equals the severity of one of

the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1

(20 CFR 416.924, 416.925, 416.926).

5.     The claimant does not have an impairment or combination of

impairments that functionally equals the severity of the listings (20

CFR 416.924(d) and 416.92a).

6.     The claimant has not been disabled, as defined in the Social

Security Act, since September 20, 2017, the date the application

was filed (20 CFR 416.924(a)).

(R. 25-39).

Accordingly, the ALJ found Plaintiff was not disabled.  (R. 40).


**V.     DISCUSSION**

Plaintiff presents two related claims in her request for review: (1) given the medical and school records, the ALJ erred as a matter of law and fact in deciding that Y.D.C.Q. did not satisfy Part B of Listing 112.08 on the basis of his Intermittent Explosive Disorder; and (2) based on the same records, the ALJ likewise committed legal and factual errors by finding that Y.D.C.Q. did not satisfy Part B of Listing 112.11 because of his ADHD.  (Pl.'s Statement of Issues, ECF No. 13-1, at 1; Pl.'s Br., ECF No. 13, at 3-12).

Like the ALJ, I consider the two claims together because both listings implicate the same criteria.  (*See* R. 26-39).  The ALJ first addressed whether Y.D.C.Q.'s mental impairments, considered singly or together, met or medically equaled the criteria for either Listing 112.08 (personality and impulse-control disorders) or Listing 112.11 (neurodevelopmental disorders). (R. 26-28).  In relevant part, paragraph B of each listing requires proof of: "Extreme limitation of

13

one, or marked limitation of two, of the following areas of mental functioning (see 112.00F): 1. Understand, remember, or apply information (see 112.00E1).  2. Interact with others (see 112.00E2).  3. Concentrate, persist, or maintain pace (see 112.00E3).  4. Adapt or manage oneself (see 112.00E4)."[5]  20 C.F.R. pt. 404, subpt. P, app. 1, §§ 112.08B, 112.11B.  The ALJ found that Y.D.C.Q. had mild limitations in understanding, remembering, or applying information; moderate limitations interacting with others; moderate limitations in concentrating, persisting or maintaining pace; and mild limitations in adapting or managing oneself.  (*Id.*).

After determining that the child's impairments did not meet or medically equal a listing as a minor, the ALJ next analyzed whether he had an impairment (or a combination of impairments) that functionally equaled the severity of the two listings.  (R 28-39).  Based on her consideration of the testimony of both Y.D.C.Q. and his mother, the medical evidence, and the school records, the ALJ found that Y.D.C.Q.'s medically determinable impairments could reasonably be expected to cause the alleged symptoms but that the allegations concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence.  (R. 28-32).  After considering the opinion evidence (R. 32-33), the ALJ found that Y.D.C.Q. had: (1) a less than marked limitation in acquiring and using information; (2) less than a marked limitation in attending and completing tasks; (3) less than a marked limitation in interacting and relating to others; (4) no limitation in moving about and manipulating objects; (5) less than a marked limitation in the ability to care for himself; and (6) no limitation in health and physical well-being.  (R. 33-39).  The ALJ thus concluded that

---

[5] Plaintiff also discusses the paragraph A criteria for the two listings in her brief.  (Pl.'s Br., ECF No. 13, at 3-12).  However, the ALJ determined that a detailed discussion of the paragraph A criteria was not required because she found that Y.D.C.Q. did not satisfy the criteria under paragraph B.  (R. 26).  Because the ALJ properly disposed of this case under paragraph B, I do not consider the criteria established by paragraph A.

Y.D.C.Q. did not have an impairment or combination of impairments that resulted in marked limitations in two domains of functioning or an extreme limitation in one domain of functioning. (R. 39).

Plaintiff argues that the evidence proves that Y.D.C.Q. had an extreme limitation in one or marked limitations in two of the following areas of mental functioning under Listing 112.08: interacting with others and adapting or managing oneself.  (Pl.'s Br., ECF No. 13, at 3-9).  She also insists that the evidence demonstrates that the child had at least one extreme or two marked limitations in the areas of mental functioning for purposes of Listing 112.11.  (*Id.* at 10-12). Plaintiff argues that the ALJ did not consider either the school authorities' ratings or the evidence of Y.D.C.Q.'s high level of hyperactivity, inattention, and aggression.  (*Id.* at 9-12) (citing R. 31, 37).  The ALJ also purportedly placed too much weight on the child's medical visits, his grades, his testimony at the hearing, and the child's treatment goals and objectives instead of focusing on the observations of school personnel, Plaintiff's own testimony, and the evidence of the child's actual misbehavior and lack of friends.  (*Id.*).  In her response, the Acting Commissioner argues that substantial evidence supports the ALJ's findings that Y.D.C.Q. did not meet the paragraph B criteria for either listing.  (Def.'s Br., ECF No. 14, at 3-8).  According to the Acting Commissioner, Plaintiff is asking this Court to re-weigh the evidence, which it cannot do.  (Def.'s Br., ECF No. 14, at 8).  I agree with the Acting Commissioner that the ALJ's decision is supported by substantial evidence.

### A.     The ALJ's Consideration of the Evidence

According to Plaintiff, the ALJ failed to take into consideration the school authorities' "ratings" and "disregarded" evidence of Y.D.C.Q.'s hyperactivity, inattention, and aggression in school and at home.  (Pl.'s Br., ECF No. 13, at 11-12).  As a threshold requirement, it is the ALJ's obligation "to hear and evaluate all relevant evidence in order to determine whether an

applicant is entitled to disability benefits." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981). The ALJ must provide "not only an expression of the evidence [she] considered which supports the result, but also some indication of the evidence which was rejected." *Id*. at 705. This is necessary so that a reviewing court can understand the basis of the ALJ's decision and determine whether the decision was proper. *Id*. at 707. The duty to develop the record does not require the ALJ to refer to every piece of evidence submitted. *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir.1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."); *see also Phillips v. Barnhart*, 91 F. App'x. 775, 780 n.7 (3d Cir.2004) (agreeing with the Eighth Circuit in *Black*). Accordingly, the ALJ need not discuss "every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). Rather, the ALJ's opinion "read as a whole [must] illustrate [] that the ALJ considered the appropriate factors in reaching [his] conclusion." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).

I am satisfied that the ALJ considered and evaluated all relevant evidence and set forth "an adequate basis so that [I] can determine whether the administrative decision is based on substantial evidence," *Cotter*, 642 F.2d at 704, 706.

Initially, in her narrative summary of the evidence, the ALJ reviewed the testimony of Plaintiff and Y.D.C.Q., and the medical records from Esperanza Health Center, Cognitive Behavioral Services, and Dr. Crichlow. (R. 29-31). As part of her review of the medical records, she summarized what Plaintiff reported about her son at the treatment sessions and evaluations. (*Id.*). She then summarized the school records, including the child's grades and the complaints that Plaintiff made to school personnel. (R. 31-32). Explicitly addressing the child's school-based services, the ALJ explained that the February 2018 CBE was conducted by Ms. Buck to determine whether Y.D.C.Q. should receive STS services from the school district after a

referral was made by the school counselor, who reported that the child had conflicts with peers and was easily distracted and impulsive. (R. 31) (citing R. 409-16).  Noting that the child was recently suspended for simple assault, the ALJ acknowledged that similar behavioral problems were reported by the child's teacher, the STS staff, and Plaintiff herself.  (*Id.*) (citing R. 409). The ALJ also recognized that, as part of the August 2018 CBE, the Plaintiff reported that her child had problems with hyperactivity, fighting with his peers, disrespecting teachers, irritability, hallucinations, and sleeping.  (*Id.*).  She summarized the teacher's revised TRF scores and ratings, specifically observing that Y.D.C.Q.'s "Total Problems" and "Externalizing" scores were both in the clinical range above the 90th percentile for boys aged six to eleven and that his total adaptive functioning score was normal.  (R. 31-32) (citing R. 621-23).  According to the ALJ, Plaintiff still qualified for STS services because the ratings indicated that the teacher reported more problems than typically reported by teachers in the areas of social relationships, thought problems, rule-breaking behavior, and aggressiveness.  (*Id.*) (citing R. 623, 625).

The ALJ considered the relevant evidence, including the child's ratings, the school records, and Plaintiff's complaints, and provided an adequate explanation for why she determined that none of Y.D.C.Q.'s impairments met the applicable criteria under paragraph B of Listings 112.08 or 112.11, *see, e.g.*, *Cotter*, 642 F.2d at 704, 706.  In fact, the ALJ relied on Plaintiff's testimony and the school ratings and records to find that Y.D.C.Q. did not have an extreme or marked limitation in any of the four areas of mental functioning.  (*See* R. 26-28).

Plaintiff specifically disputes the ALJ's finding that Y.D.C.Q. had only a moderate limitation in the area of interacting with others.  (Pl.'s Br., ECF No. 13, at 11).  However, the ALJ acknowledged that Plaintiff testified at the hearing that her son is always fighting, arguing, or hitting others and has been suspended from school for his misconduct.  (R. 26) (citing R. 47-82).  Citing to the school district's suspension notice, the ALJ found that Y.D.C.Q. received a

suspension for simple assault.  (R. 26) (citing R. 303-04).  It was also recognized that the child received school-based services for his behavioral problems and that the school records documented problems with social relationships, rule-breaking behavior, aggression, and impulsivity.  (*Id.*) (citing R. 409, 625).  Having summarized the child's issues and the services he received, he ALJ cited to the school records identifying several contributory factors for his behavior, including a language barrier, a history of exposure to domestic violence, fighting at home, and allegations that he was the victim of physical abuse.  (R. 26-27) (citing R. 646).  She additionally recognized that, according to his teacher, the child, despite acting aggressively during lunch and recess, seemed to be interested in behaving in the classroom.  (R. 27) (citing R. 645).

The ALJ determined that Y.D.C.Q. had a mild limitation in understanding, remembering, or applying information.  (R. 26).  She noted that the records and Plaintiff's testimony indicated that he was enrolled in regular education classes, his learning progress was not limited, and he generally received passing grades.  (*Id.*) (citing R. 47-82, 241-50, 606-08, 635, 642-43).

As to her finding of a moderate limitation in concentration, persistence, and maintenance of pace, the ALJ acknowledged Plaintiff's report that her son had limitations in his ability to pay attention, stick with a task, and sit still, and the ALJ also observed that Y.D.C.Q. was receiving STS services targeted at improving his attentive and on-task behaviors.  (R. 27) (citing R. 47-82, 241-50, 647-48).  However, the ALJ explained that the school records indicated that he participated in regular and ESOL classes and mainly received passing grades.  (*Id.*) (citing R. 47-82, 606-08, 635, 642-43).

Finally, the ALJ explicitly considered both the school records and Plaintiff's testimony in her assessment of Y.D.C.Q.'s ability to adapt or manage himself.  (R. 27-28).  According to the ALJ, his mother testified that he plays outside, goes to the park with his uncle, plays electronic

games, watches cartoons and videos, and writes, paints, and draws.  (R. 27) (Citing R. 47-87).

The ALJ found that Y.D.C.Q. did have some challenges with emotional regulation but observed

did not require any higher level of care than therapy, such as partial hospitalization programs,

intensive outpatient programs, psychiatric hospitalizations, or crisis interventions.  (*Id.*).  The

ALJ also determined that the school-based services and outpatient mental health treatment

clearly helped with his emotional problems.  (*Id.*)  As support, the ALJ cited to the school

district's October 2018 STS plan, which indicated that the child seemed to be interested in

behaving in the classroom even though he was physically aggressive with some of his classmates

during lunch and recess.  (R. 27-28) (citing R. 645).  The ALJ also again observed that Y.D.C.Q.

generally received passing grades and had not repeated any grade levels.  (R. 28) (citing R. 606-

08, 635, 642-43).

### B.      Substantial Evidence

Plaintiff argues that the evidence demonstrates that her son had extreme or marked

limitations in the areas of interacting with others and adapting or managing himself for purposes

of Listing 112.08 and at least an extreme limitation in one or marked limitations in two of the

four areas of mental functioning under Listing 112.11.  (Pl.'s Br., ECF No. 13, at 3-12).

According to Plaintiff, the ALJ erred by focusing on her medical visits, which were short in

duration and occurred in a strictly therapeutic setting, instead of placing more weight upon the

observations of school personnel, who often spend more time with students than their parents

and regularly must address inappropriate behaviors.  (*Id.* at 11) (citing R. 27).  The ALJ

purportedly "made light" of the school staff's evaluation documenting problems in social

relationships, rule-breaking behavior, aggression, and impulsivity.  (*Id.*) (quoting R. 26).

Plaintiff states that the ALJ likewise placed too much weight on Y.D.C.Q.'s grades, the child's

testimony, and the treatment goals and objectives included in the school district's October 2018

STS plan. (*Id.* at 11-12). She further indicates that her son had no friends because of his history of altercations and other inappropriate interactions. (*Id.* at 10-11).

A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *See, e.g.*, *Hartranft*, 181 F.3d at 360. The Third Circuit has instructed, "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the substantial evidence standard embraces a qualitative review of the evidence, and not merely a quantitative approach. *See, e.g.*, *id.*; *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

It is not the role of the Court to re-weigh the evidence of record or substitute its own conclusions for that of the ALJ. *See e.g., Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). If the ALJ's conclusion is supported by substantial evidence, this Court may not set aside the Commissioner's decision, even if it would have decided the factual inquiry differently. *See, e.g.*, *Hartranft*, 181 F.3d at 360. Although there may be "other evidence in the record that could support a finding" in favor of the claimant, "our inquiry is not whether the ALJ could have reasonably made a different finding based on this record." *Simmonds*, 807 F.2d at 58.

I conclude that the ALJ's factual determination that Y.D.C.Q. did not satisfy the paragraph B criteria applicable under Listings 112.08 or 112.11 is supported by substantial evidence.

First, her finding that Y.D.C.Q. had only a mild limitation in the area of understanding, remembering, or applying information is supported by evidence showing that he mostly received passing grades in regular education classes with ESOL and STS support and did not repeat any

grade levels, Plaintiff's admission in the Child Function Report that her son's ability to progress in learning is not limited, and the results of Y.D.C.Q.'s TONI-4 assessment, which indicated average perceptual functioning and intact memory.  (R. 26, 58-59, 64-65, 73, 245, 386-87, 606, 609-17, 635, 624, 642-53).

Next, the ALJ reasonably found that Y.D.C.Q. had a moderate limitation in interacting with others.  (R. 21).  Her finding is adequately supported by the fact that, despite the evidence in the record that the child had problems dealing with others, the school records also identified several factors that possibly contributed to his misbehavior, i.e., a language barrier, exposure to domestic violence, and allegations and an investigation of physical abuse.  (R. 26-27, 415, 613, 625, 646).  Additionally, the October 2018 STS plan explicitly stated that, according to Y.D.C.Q.'s teacher, he seemed to be interested in completing his classwork and behaving in the classroom.  (R. 27, 645).  The Cognitive Behavioral Services therapy notes similarly indicated some improvement in the child's behavior.  (R. 27, 417-525).  For instance, Plaintiff said at the December 5, 2017 therapy session that she believed the medication was helping "a lot" and that a teacher had told her that there was improvement in her son's behavior.  (R. 462).  Y.D.C.Q.'s mental status examinations also usually showed that he was cooperative and had normal speech, mood, and affect.  (R. 27, 343-44, 385-86, 412, 446-47, 449-57, 473-502, 509-24, 532, 534, 536, 538, 540, 577-79, 595, 622).  Furthermore, Y.D.C.Q. was enrolled in regular education classes and did not repeat any grade level.  (R. 27, 252, 505, 635, 642).

As to the ALJ's finding of a moderate limitation concentrating, persisting, or maintaining pace, Y.D.C.Q. testified that he completes his homework in a timely fashion.  (R. 27, 56).  In addition, the medical records, including the results of a nonverbal intelligence test, generally showed intact/unimpaired attention and concentration and normal psychomotor activity, with only occasional findings of impaired memory.  (R. 27, 343-44, 385-87, 412, 446-47, 449-57,

473-502, 509-24, 532, 534, 536, 538, 540, 577-79, 595, 622).  The school records indicated that he mainly received passing grades in regular education classes.  (R. 27, 606, 635, 642).

Turning to the final area of mental functioning, substantial evidence in the record supports the ALJ's finding that the child had only a mild limitation in adapting or managing himself.  (R. 27).  Y.D.C.Q. testified that he could shower, dress himself, and help clean the house, and his mother also testified that he enjoys playing outside and going to the park with his uncle and that he writes, paints, and draws.  (R. 27, 65-66, 70, 75).  Y.D.C.Q.'s mental status examination findings generally showed appropriate appearance, insight, and judgment, and the CBE conducted in August 2018 to assess his ongoing need for STS services confirmed that his adaptive functioning was in the normal range.  (R. 27-28, 343-44, 385-87, 412, 446-47, 449-57, 473-502, 509-24, 532, 534, 536, 538, 540, 565, 577-79, 595, 622-23, 645).  The Cognitive Behavioral Services records also indicated that he at least was trying  to improve himself.  (R. 28, 442, 445, 448, 450, 452, 462).  Finally, Y.D.C.Q. generally earned passing grades, and his teacher similarly reported that he seemed interested in behaving in the classroom.  (R. 27, 645).

Although Plaintiff cites evidence that might have supported a finding of extreme or marked limitations under paragraph B (Pl.'s Br, ECF No. 13, at 3-12), this fact alone is not a basis for remand because substantial evidence supports the ALJ's findings that Y.D.C.Q. did not have an extreme or marked limitation in any of the applicable areas of mental functioning.  *See, e.g., Simmonds,* 58 F.2d at 58 ("While there is other evidence in the record that could support a finding of disability . . ., our inquiry is not whether the ALJ could have reasonably made a different finding based on this record.  Rather, we must review whether the ALJ's actual findings are supported by substantial record evidence.").  I am "not permitted to weigh the evidence or substitute [my] conclusions for that of the [administrative] fact-finder." *Burns*, 312 F.3d at 118 (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

In this case, the ALJ appropriately weighed all the evidence, including the child's grades, the ratings and observations made by school staff, the goals, objectives, and effectiveness of the mental health treatment and school-based services provided to the child, the medical examinations, and the observations of his mother. The ALJ relied on both the school records and Plaintiff's testimony to find that Y.D.C.Q.'s impairments did not meet paragraph B. (*See supra* Section V.A.). As the Plaintiff acknowledges (Pl.'s Br, ECF No. 13, at 11), the ALJ explicitly recognized that "[i]nformation gathered from the claimant's teachers and STS staff in connection with various STS evaluations documented problems in social relationships, rule-breaking behavior, problems of an aggressive nature, and impulsivity." (R. 26) (citing R. 409, 625). She then properly weighed this evidence against other observations included in the child's school records, specifically the various psychosocial and contextual factors and the teacher's assessment that he seemed interested in behaving in the classroom. (R. 26-27 (citing 645-46)). Plaintiff's own testimony provides additional support for the ALJ's findings. As the ALJ observed, Plaintiff stated that Y.D.C.Q. received grades ranging from A to D and enjoys participating in different activities such as playing outside and painting. (R. 26-28, 70, 73, 75). Additionally, there is substantial evidence that the therapy, STS, and ESOL classes benefited Y.D.C.Q., that he was often cooperative and well behaved, and that he had largely unremarkable mental status findings. (*See, e.g.*, R. 26-28, 343-44, 385-86, 462, 645).

Plaintiff suggests that her son did not have any friends. (Pl.'s Br., ECF No. 13, at 10-11). However, Plaintiff does not cite to any evidence to support her claim that Y.D.C.Q. had no friends; she instead merely claims that no teacher or STS staff member reported that Y.D.C.Q. had a friend (*id.*). In fact, Y.D.C.Q. testified that he has friends at school and a friend in his neighborhood. (R. 29, 61-62, 67-68). He was able to name these friends at the hearing. (*Id.*). While Plaintiff and her son disagreed at the hearing over whether he really had a friend outside

23

of school (R. 70), Plaintiff did note in the Child Function Report she completed that her son could not make new friends but still has friends his or her own age (R. 247). The school district's February 2018 CBE also indicated that Plaintiff reported that Y.D.C.Q. had four or more friends. (R. 413).

Finally, Plaintiff contends that Y.D.C.Q.'s testimony is not credible concerning her interactions with others, especially when his testimony is compared with the school records. (Pl.'s Br., ECF No. 13, at 11). According to Plaintiff's brief, "[t]he child and his mother were both very poor historians at the time of the hearing." (*Id.*at 2). The ALJ is empowered to evaluate and determine the credibility of witness testimony and will consider all evidence when making her decision. *See, e.g.*, 20 C.F.R. § 416.924a(a); DSR 09-2p; *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000). As detailed above, the ALJ properly weighed the relevant evidence in the record and explained why she found that this evidence did not support a finding that Y.D.C.Q. satisfied the criteria of Listings 112.08 or 112.11. Substantial evidence, including the school records, supports the ALJ's findings of fact.

## VI.  CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **DENIED**. An appropriate Order follows.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge